# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| GARY D. WOODS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. CIV-12-288-FHS-SPS |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of the Social | ) |
| Security Administration,[1] | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

The claimant Gary D. Woods requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). The claimant appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining he was not disabled. As discussed below, the undersigned Magistrate Judge RECOMMENDS that the Commissioner's decision be REVERSED and the case REMANDED to the ALJ for further proceedings.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his

---

[1] On February 14, 2013, Carolyn Colvin became the Acting Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), Ms. Colvin is substituted for Michael J. Astrue as the Defendant in this action.

age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he

---

[2] Step one requires the claimant to establish that he is not engaged in substantial gainful activity. Step two requires the claimant to establish that he has a medically severe impairment (or combination of impairments) that significantly limits his ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or his impairment *is not* medically severe, disability benefits are denied. If he *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, he is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that he lacks the residual functional capacity (RFC) to return to his past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given his age, education, work experience and RFC. Disability benefits are denied if the claimant can return to any of her past relevant work or if his RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

## Claimant's Background

The claimant was born on September 9, 1964, and was forty-six years old at the time of the administrative hearing (Tr. 30, 132). He has a high school education and past relevant work as a product assembler (Tr. 20). The claimant alleges that he has been unable to work since January 22, 2009, because of a pacemaker, neck injuries, and back problems (Tr. 165).

## Procedural History

The claimant applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income payments under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85, on July 24, 2009 (Tr. 201). His applications were denied. ALJ Osly F. Deramus conducted an administrative hearing and issued a written opinion on December 17, 2010, finding that the claimant was not disabled (Tr. 11-22). The Appeals Council denied review, so the ALJ's written opinion is the Commissioner's final decision for purposes of appeal. *See* 20 C.F.R. § 404.981, 416.1481.

## Decision of the Administrative Law Judge

The ALJ made his decision at step five of the sequential evaluation. He found that the claimant had the residual functional capacity ("RFC") to perform the full range of light work (Tr. 15). The ALJ concluded that although the claimant could not return to any past relevant work, he was not disabled according to Medical-Vocational Rule 202.21, 20 C.F.R. Pt. 404, Subpt. P, App. 2, *i. e.*, the "Grids" (Tr. 21). Thus, the ALJ concluded that the claimant was not disabled at step five (Tr. 435-36).

## Review

The claimant contends that the ALJ erred: (i) by failing to fully and fairly develop the record; (ii) by improperly analyzing his impairments at step two; (iii) by failing to properly analyze his RFC at step four; and, (iv) by improperly applying the Grids to find him not disabled at step five. The undersigned Magistrate Judge finds the claimant's third contention persuasive.

The record reveals that the claimant first received treatment from Dr. David Trent, D.O. on March 24, 2008 after passing out the night before while fixing a plate of food (Tr. 283). At that time, the claimant reported that he had been experience shortness of breath on exertion, chest tightness, and feelings of being light-headed (Tr. 283). The claimant reported that he had been experiencing dizziness, low blood pressure and falling down on August 29, 2008 (Tr. 279). On October 23, 2008, the claimant complained that he had been hit in the back of the neck the previous night and, as a result, Dr. Trent

diagnosed a cervical strain and prescribed Lorcet and Robaxin (Tr. 277). The claimant continued to complain of neck pain, and complained of light shoulder pain on December 11, 2008 (Tr. 275-76). By January 2009, the claimant had complaints of increased lower back pain radiating to his left leg and knee, and as a result, the claimant stopped working (Tr. 270).

Dr. Trent then referred the claimant to Dr. Thomas E. Cheyne, M.D. at River Valley Musculoskeletal Center (Tr. 270). Dr. Cheyne's impression was that the claimant had chronic lumbar pain of uncertain etiology with possible radiculopathy, and the claimant was referred to physical therapy (Tr. 320). At CT scan performed in February 2009 revealed a mild to moderate disc protrusion at L4-5, a moderate disc bulge at L3-4, and a mild to moderate disc bulge at L2-3 (Tr. 312). Dr. Cheyne recommended a lumbar epidural steroid injection and that claimant stay off of work (Tr. 312). The claimant saw Dr. Cheyne again on April 16, 2009, at which time he complained that his lower back pain had been exacerbated because his daughter had jumped on his back (Tr. 310). Dr. Cheyne recommended another lumbar epidural steroid injection, physical therapy, and that the claimant remain off of work (Tr. 310).

Because the claimant failed to respond to physical therapy or medications, Dr. Cheyne referred the claimant to neurosurgeon Dr. Arthur Johnson, M.D. (Tr. 305, 354). The claimant complained of back pain radiating into the left lower extremity and numbness in the left lower extremity (Tr. 354). Dr. Johnson noted that the claimant was in moderate distress secondary to his pain, had a limp favoring the left lower extremity,

and exhibited a positive straight leg lift on the left side (Tr. 355). The impression at that time was lumbar disc disease of left lower extremity radiculopathy (Tr. 355). Dr. Johnson referred the claimant for a myelogram, but the results were negative (Tr. 353).

Dr. Trent completed a Physical Residual Functional Capacity Evaluation on May 14, 2010 in which he opined that the claimant could sit for 15 minutes at a time and stand and walk for 20 minutes at a time, respectively, and that claimant needed rest breaks at hourly intervals or more (Tr. 358). Dr. Trent further opined that the claimant could occasionally lift and/or carry up to 10 pounds, the use of his lower extremities were limited, and that the claimant could occasionally push/pull and rarely work in the extended position (Tr. 358-59). Additionally, Dr. Trent found that the claimant could rarely bend, stoop, balance, twist, and climb stairs but should never squat, crawl, crouch, kneel, or climb ladders, ramps, and scaffolds (Tr. 359). Finally, Dr. Trent placed the following restrictions on the claimant: (i) he could not be near hazardous conditions, such as unprotected heights and dangerous moving machinery, or handle any vibrating tools; (ii) he had marked limitations in his ability to drive or ride in automotive equipment; and, (iii) he had moderate limitations in his ability to be exposed to respiratory irritants such as fumes, dust, gases, or odor, and to wind and other extremes, such as sudden or frequent changes in temperature and/or humidity (Tr. 360).

Subsequent to the ALJ's decision denying benefits, the claimant was examined by Dr. Robert Spray, Ph.D., who performed a psychological evaluation on February 24, 2011 (Tr. 423-26). At that time, the claimant reported that he spends most of his time

sitting at home, and he is unable to help with most household chores because of his pain (Tr. 424). The claimant was also noted to experience crying spells three to four times per month, and he reported that he has not taken medication for one year because he cannot afford it (Tr. 424). Dr. Spray opined that the claimant's estimated IQ was low average, and the claimant's mood was somber (Tr. 425). The claimant's results on the Pain Patient Profile indicated that he had a higher than average level of depression, anxiety, and somatization (Tr. 425). His Somatization score suggested that he "may have difficulty attending to tasks and to social and environmental cues" and that he "may have trouble adhering to a detailed or multifaceted treatment program" (Tr. 425-26). The claimant's Depression and Anxiety scores were significantly above average for pain patients (Tr. 426). Dr. Spray's diagnostic impression was adjustment disorder with depressed mood and pain disorder (Tr. 426).

Based on his evaluation, Dr. Spray also completed a Residual Functional Capacity Secondary to Mental Impairments, Including Pain, Fatigue, and Hysterical Paralysis (Tr. 427-30). Dr. Spray opined that the claimant had severe limitations in the following functional categories: (i) performing activities within a schedule; (ii) being punctual within customary tolerances; (iii) completing a normal workday (without interruptions from psychologically-based or pain-related symptoms); (iv) completing a normal workweek (without interruptions from psychologically-based or pain-related symptoms); (v) performing at a consistent pace; (vi) performing without an unreasonable number or length of rest periods; and, (vii) behaving in an emotionally stable manner (Tr. 428-29).

Further, Dr. Spray found that the claimant had marked limitations in the following functional categories: (i) dealing with work stresses; (ii) functioning independently; (iii) understanding detailed or complex instructions; (iv) remembering detailed or complex instructions; (v) maintaining attention for extended periods of time; (vi) maintaining concentration for extended periods of time; (vii) sustaining an ordinary routine without special supervision; (viii) making simple work-related decisions; (ix) avoiding undue constriction of interests; (x) responding and adjusting to the use of new and unfamiliar tools and/or machines; and, (xi) accepting instructions and responding appropriately to criticism from supervisors (Tr. 427-29).

Medical opinions from a treating physician are entitled to controlling weight if they were "'well-supported by medically acceptable clinical and laboratory diagnostic techniques . . . [and] consistent with other substantial evidence in the record.'" *See Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004), *quoting Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). If a treating physician's opinions were not entitled to controlling weight, the ALJ must determine the proper weight to give them by analyzing the factors set forth in 20 C.F.R. § 416.927. *Id.* at 1119 ("Even if a treating physician's opinion is not entitled to controlling weight, '[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in § [416.927].'"), *quoting Watkins*, 350 F.3d at 1300. Those factors are: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship, including the treatment provided and the kind of

examination or testing performed; (iii) the degree to which the physician's opinion is supported by relevant evidence; (iv) consistency between the opinion and the record as a whole; (v) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (vi) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Watkins,* 350 F.3d at 1300-01, *citing Drapeau v. Massanari,* 255 F.3d 1211, 1213 (10th Cir. 2001) [quotation omitted]. Finally, if the ALJ decides to reject a treating physician's opinions entirely, "he must . . . give specific, legitimate reasons for doing so[,]" *id*. at 1301 [quotation marks omitted; citation omitted], so it is "clear to any subsequent reviewers the weight [he] gave to the treating source's medical opinion and the reasons for that weight." *Id*. at 1300 [quotation omitted].

The ALJ rejected the opinion of treating physician Dr. Trent for the following reasons: (i) Dr. Trent was a family practitioner, "presumed to be untrained in the detailed evaluation, diagnosis, and treatment of complex musculoskeletal disorders"; (ii) his opinion was "not supported by any treatment notes or by the results of clinical or diagnostic testing;" and, (iii) Dr. Trent's opinion was inconsistent with the medical evidence of record (Tr. 20). The ALJ's analysis of Dr. Trent's opinion is flawed for a couple of reasons. First, the ALJ stated that Dr. Trent's opinion was unsupported by results of clinical or diagnostic testing and unsupported by the medical evidence of record. In fact, a CT scan performed by Dr. Cheyne in February 2009 revealed a mild to moderate disc protrusion at L4-5, a moderate disc bulge at L3-4, and a mild to moderate disc bulge at L2-3 (Tr. 312). Further, from February 2009 through at least June 2009, Dr.

Cheyne felt that the claimant's back pain was severe enough to keep him from working (Tr. 307-12). The ALJ, however, disregarded this evidence in his discussion and analysis of Dr. Trent's opinion, which is improper. *Taylor v. Schweiker*, 739 F.2d 1240, 1243 (7th Cir. 1984) ("'[A]n ALJ must weigh all the evidence and may not ignore evidence that suggests an opposite conclusion.'"), *quoting Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982). Second, the ALJ chose to reject Dr. Trent's opinion in favor of Dr. Johnson's opinion that the "claimant had no lesions that were amenable to surgical correction" and which discharged the claimant from the neurosurgery clinic (Tr. 20, 416). But Dr. Johnson's opinion only addressed the claimant's impairments from a *neurological standpoint*, and the claimant's complaints are largely musculoskeletal. Dr. Johnson's opinion that "no additional treatments were necessary" was given in a limited context and did not purport to support the proposition that the claimant's impairments caused him no problems whatsoever (Tr. 416).

The claimant also argues that the ALJ did not properly consider his mental health impairments. This argument is based on evidence submitted to the Appeals Council after the hearing. The Appeals Council must consider such additional evidence if it is: (i) new; (ii) material; and, (iii) "related to the period on or before the date of the ALJ's decision." *Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004), *quoting Box v. Shalala*, 52 F.3d 168, 171 (8th Cir. 1995). The parties do not address whether the evidence submitted by after the administrative hearing qualifies as new, material and chronologically relevant, but the Appeals Council considered it, and the Court therefore has no difficulty

concluding that it does qualify.

First, evidence is new if it "is not duplicative or cumulative." *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003), *quoting Wilkins v. Sec'y, Dep't of Health & Human Svcs.*, 953 F.2d 93, 96 (4th Cir. 1991). The evidence submitted by the claimant to the Appeals Council clearly was new evidence. The Psychological Evaluation and accompanying Residual Functional Capacity Secondary to Mental Impairments, Including Pain, Fatigue and Hysterical Paralysis from Dr. Robert L. Spray, Ph.D. was neither duplicative nor cumulative because it was not presented to the ALJ prior to his decision. Further, there was no consultative examination performed on the claimant with regard to his psychological impairments. Second, evidence is material "if there is a reasonable possibility that [it] would have changed the outcome." *Threet*, 353 F.3d at 1191, *quoting Wilkins v. Sec'y, Dep't of Health & Human Svcs.*, 953 F.2d 93, 96 (4th Cir. 1991). In other words, the evidence must "reasonably [call] into question the disposition of the case." *Id. See also Lawson v. Ch*ater, 1996 WL 195124, at *2 (10th Cir. April 23, 1996). The mental health evaluation performed by Dr. Spray suggests that the claimant's mental impairment was severe enough to impact his RFC, despite the fact that the claimant's only medical treatment for depression came from his primary care physician Dr. Trent. Finally, the evidence is chronologically relevant when it pertains to the time "period on or before the date of the ALJ's Decision." *Kesner v. Barnhart*, 470 F. Supp. 2d 1315, 1320 (D. Utah 2006), *citing* 20 C.F.R. § 404.970(b). Although the evaluation occurred subsequent to the ALJ's decision, it also occurred prior to the claimant's date

last insured.

Since the evidence presented by the claimant after the administrative hearing *does* qualify as new and material evidence under C.F.R. §§ 404.970(b) and 416.1470(b), and the Appeals Council considered it, such evidence "becomes part of the record we assess in evaluating the Commissioner's denial of benefits under the substantial-evidence standard." *Chambers*, 389 F.3d at 1142, *citing O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994). In light of this new evidence, the Court finds that the ALJ's decision is not supported by substantial evidence for several reasons.

First, the ALJ's written decision denying benefits does not address the psychological evaluation performed by Dr. Spray. Though Dr. Spray undoubtedly did not qualify as a treating physician whose opinion was entitled to controlling weight, the ALJ is still required to analyze the proper weight to give the opinion by applying "all of the factors provided in [s] 404.1527." *Id.*, *quoting Watkins*, 350 F.3d at 1300, *quoting* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5. *See also Hamlin v. Barnhart,* 365 F.3d 1208, 1215 (10th Cir. 2004) ("An ALJ must evaluate *every* medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional. . . . An ALJ must also consider a series of specific factors in determining what weight to give *any* medical opinion.") [internal citation omitted] [emphasis added], *citing Goatcher v. United States Department of Health & Human Services,* 52 F.3d 288, 290 (10th Cir. 1995). The ALJ had no opportunity to perform this analysis, and while the Appeals Council considered

the new evidence, they failed to analyze it in accordance with the aforementioned standards. The decision of the Commissioner must therefore be reversed and the case remanded to the ALJ for further proceedings.

Because the ALJ failed to properly analyze the medical evidence as outlined above, the undersigned Magistrate Judge concludes that the decision of the Commissioner should be reversed and the case remanded to the ALJ for a proper analysis of the medical evidence of record.

## Conclusion

The undersigned Magistrate Judge finds that correct legal standards were not applied by the ALJ and that the decision of the Commissioner is therefore not supported by substantial evidence. Accordingly, the Magistrate Judge RECOMMENDS that the ruling of the Commissioner of the Social Security Administration be REVERSED and the case REMANDED for further proceedings not inconsistent herewith. Any objections to this Report and Recommendation must be filed within fourteen days. *See* Fed. R. Civ. P. 72(b).

**DATED** this 13th day of September, 2013.

Steven P. Shreder
United States Magistrate Judge
Eastern District of Oklahoma